IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

DANELL M. KITTELSON,

    Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,[1]

    Defendant.

No. C12-0094

RULING ON JUDICIAL REVIEW

## TABLE OF CONTENTS

I.    *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    *PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    *PRINCIPLES OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.    *FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    *A.*    *Educational and Employment Background* . . . . . . . . . . . . . . . . . 5
    *B.*    *Administrative Hearing Testimony* . . . . . . . . . . . . . . . . . . . . 5
        *1.*    *Kittelson's Testimony* . . . . . . . . . . . . . . . . . . . . . . 5
        *2.*    *Vocational Expert's Testimony* . . . . . . . . . . . . . . . . . 7
    *C.*    *Kittelson's Medical History* . . . . . . . . . . . . . . . . . . . . . . . . 8

V.    *CONCLUSIONS OF LAW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    *A.*    *ALJ's Disability Determination* . . . . . . . . . . . . . . . . . . . . . . 12
    *B.*    *Objections Raised By Claimant* . . . . . . . . . . . . . . . . . . . . . . 15
        *1.*    *Credibility Determination* . . . . . . . . . . . . . . . . . . . . 15
        *2.*    *RFC Assessment* . . . . . . . . . . . . . . . . . . . . . . . . . 19

---

    [1] Plaintiff originally filed this case against Michael J. Astrue, the Commissioner of Social Security Administration ("SSA"). On February 14, 2013, Carolyn W. Colvin became Commissioner of the SSA. The Court, therefore, substitutes Commissioner Colvin as the Defendant in this action. FED. R. CIV. P. 25(d)(1).

*VI.* *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*VII.* *ORDER* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Danell M. Kittelson on September 25, 2012, requesting judicial review of the Social Security Commissioner's decision to deny her applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Kittelson asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, Kittelson requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On June 22, 2009, Kittelson applied for both disability insurance benefits and SSI benefits. In her applications, Kittelson alleged an inability to work since December 9, 2008 due to neck pain, right arm pain, a voice impairment, and depression. Kittelson's applications were denied on July 30, 2009. On September 18, 2009, her applications were denied on reconsideration. On November 27, 2009, Kittelson requested an administrative hearing before an Administrative Law Judge ("ALJ"). On March 22, 2011, Kittelson appeared via video conference with her attorney before ALJ Julie K. Bruntz for an administrative hearing. Kittelson and vocational expert Julie A. Svec testified at the hearing. In a decision dated March 30, 2011, the ALJ denied Kittelson's claims. The ALJ determined that Kittelson was not disabled and not entitled to disability insurance benefits or SSI benefits because she was functionally capable of performing work that exists in significant numbers in the national economy. Kittelson appealed the ALJ's decision. On

July 30, 2012, the Appeals Council denied Kittelson's request for review. Consequently, the ALJ's March 30, 2011 decision was adopted as the Commissioner's final decision.

On September 25, 2012, Kittelson filed this action for judicial review. The Commissioner filed an Answer on December 4, 2012. On January 4, 2013, Kittelson filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that she is not disabled and that she is functionally capable of performing work that exists in significant numbers in the national economy. On March 5, 2013, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On October 11, 2012, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

## III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'"

*Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see*

*also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Educational and Employment Background

Kittelson was born in 1965. She is a high school graduate, but has no education past high school. The record contains a detailed earnings report for Kittelson. The report covers the time period of 1980 to 2011. Kittelson had minimal earnings in 1996 (less than $200). From 1997 to 2008, Kittelson earned between $2,065.36 (2005) and $11,680.81 (1998). She has no earnings since 2009.

### B. Administrative Hearing Testimony

#### 1. Kittelson's Testimony

At the administrative hearing, Kittelson's attorney questioned Kittelson about her difficulties with neck pain. Kittelson testified that the pain makes it difficult for her to move or lift things. She described the pain as "like a knife ramming into your spine, in your muscle. It's just intense, shrieking, constant pain and I've had neck braces and pillows that go around my neck and I have to, you know, lay a certain way and it's just horrible. It doesn't go away ever."[2] She rated her pain at 8 on a scale of 1 to 10 with 10 being the highest level of pain. She stated that she was most comfortable lying flat on her back, and spends most of her day laying down.

---

[2] Administrative Record at 38.

Next, Kittelson and her attorney discussed Kittelson's problems with irritable bowel syndrome ("IBS") and throat nodules:

> Q: So you started to miss work due to the IBS --
>
> A: Yes.
>
> Q: -- alone? Not other stuff?
>
> A: For that and my nodule because I had -- my doctor -- a different doctor looked on there and said you're going to have to take at least three months off to get [the nodule] to go down. I couldn't talk at all. I get like that a lot of times.
>
> Q: Just where your throat just locks -- does it feel locked up or I mean you feel --
>
> A: I just get hoarse and you can't talk. . . .
>
> Q: Oh.
>
> A: And I asked [my workplace] if there was something else that I could [do] rather than be on the phone and they said no. So they said they would just keep my spot and when I went to go back, I found out I had breast cancer and I was waiting for the pain clinic when I came back and I didn't get in there until after my breast cancer so it was just a continual long all medical problems where I couldn't work.

(Administrative Record at 41-42.)

Kittelson's attorney also asked Kittelson about her difficulties with depression. Kittelson described her typical mood as "just down and out." She stated that she receives weekly help from social workers, therapists, and doctors. She also stated that she takes multiple medications to help her depression.

The ALJ also questioned Kittelson regarding medication:

> Q: You mentioned in your testimony that you didn't want to take pain medicine, and why is that?
>
> A: I've talked to many doctors and if you're -- you're an alcoholic or addict for the rest of your life and I didn't want to get addicted and rely on pain pills, and I've tried morphine and oxycontin or whatever and they didn't do anything and so I just don't want to have to

> depend on any narcotics and I want to get this resolved
> in a different manner.

(Administrative Record at 48.) The ALJ also inquired about Kittelson's past alcohol and marijuana use. Kittelson explained that she underwent treatment in the past for both alcohol and marijuana use. At the time of the hearing, she had not used marijuana for 3 years or alcohol for 2 years.[3]

### 2. *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Julie A. Svec with a hypothetical for an individual who could:

> occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; she could stand or walk for six hours in an eight-hour workday and sit for six hours in an eight-hour workday; her ability to push and pull and operate hand and foot controls would be within the weights described above; she could occasionally climb ramps and . . . stairs; she . . . could not climb ladders, ropes, and scaffolding; she could occasionally balance stoop, kneel, and crouch, but she could not crawl; she should not do overhead reaching or lifting on the right; and I would say she would be limited with the hand controls on the right as well; she would need to avoid . . . concentrated exposures to extreme cold, extreme heat, hazards such as heights and machinery, vibration, fumes, odors, gases, poor ventilation, and dust; and further, she would be limited to simple, routine, repetitive work; she would be able to use her voice for short conversations, but not continual talking during the day.

(Administrative Record at 52-53.) The vocational expert testified that under such limitations, Kittelson could not perform her past relevant work, but could perform the following work: (1) pricer (1,000 positions in Iowa and 50,000 positions in the nation), (2) ticket taker (600 positions in Iowa and 35,000 positions in the nation), and (3) office

---

[3] Kittelson admitted, however, that she had a "couple" of relapses with alcohol during that two-year period. *See* Administrative Record at 49.

7

helper (2,000 positions in Iowa and 266,000 positions in the nation). The ALJ asked the vocational expert a second hypothetical that was identical to the first hypothetical, except that the individual "would miss three or more days of work per month[.]" The vocational expert stated that under such a limitation, Kittelson would be precluded from competitive employment.

Kittelson's attorney also questioned the vocational expert:

> Q:    . . . if the hypothetical person needed to take frequent rest breaks at unscheduled times anywhere from 10 to 20 to 30 minutes at a time, two, three, four times a day, would they be competitively employable?
>
> A:    No, they would not.
>
> Q:    If the hypothetical person needed to, in fact, lie down during the day to relieve pain from her neck and so forth, would an employer allow for any breaks where a person could lie down?
>
> A:    If they were within the regularly-scheduled work breaks I think that may be possible.
>
> Q:    Outside of that though, I mean, assuming it'd be the same answer as the extra breaks that they wouldn't allow.
>
> A:    That's correct.
>
> Q:    Another one would be due to the person's problems both with psychological issues as well as the pain levels, if the person were going to have to work at a pace that was less than regular pace -- a slow pace up to a third of the workday, would they be competitively employable?
>
> A:    No.

(Administrative Record at 54-55.)

### C. Kittelson's Medical History

On December 9, 2008, Kittelson met with Dr. Hamza Ismail, M.D., complaining of neck pain. Kittelson reported that she suffered from chronic neck pain for years. Specifically, Kittelson described having a "burning sensation in the left shoulder area and

8

neck area that causes [a] significant amount of pain" while working at a computer.[4] Kittelson told Dr. Ismail that she treated her pain with Tylenol and stretching. Dr. Ismail noted that an MRI from June 2007 showed "C5-C6 mild-to-moderate channel stenosis and posterior disc osteophytes, and the same was seen at C6 and C7 vertebrae."[5] Upon examination, Dr. Ismail diagnosed Kittelson with chronic neck pain. Dr. Ismail recommended medication and exercise as treatment. Dr. Ismail also referred Kittelson to the Pain Clinic at the University of Iowa Hospitals and Clinics for steroid injections.

Additionally in December 2008, Kittelson was also diagnosed with breast cancer. She underwent a left breast lumpectomy. Two weeks after the lumpectomy, doctors found no evidence that the cancer had spread, and found that Kittelson was doing "well." In January 2009, Kittelson began four rounds of chemotherapy. Following her chemotherapy, Dr. Geraldine Jacobson, M.D., again found that Kittelson was "doing well." In April 2009, she began six rounds of radiation. In June 2009, following radiation, Kittelson's condition was described as "good." It was noted that she "tolerated treatment well."

On May 14, 2009, Kittelson met with Dr. Kira Fraser complaining of continued neck and arm pain. Kittelson described the pain as a "burning/stabbing" pain. She stated that the pain "starts in her shoulder [and] goes down her arm and she experiences weakness and tingling in her hand."[6] Upon examination, Dr. Fraser found that Kittelson had: (1) decreased extension and flexion in her neck, (2) mild decrease turning her head to the left, (3) great deficit turning her head to the right, (4) tenderness to palpation in the cervical spine, (5) decreased right shoulder range of motion, and (6) an inability to lift her

---

[4] Administrative Record at 289.

[5] Id.

[6] Administrative Record at 385.

9

right arm above her head. Dr. Fraser diagnosed Kittelson with cervical pain, myofascial pain, and right arm pain and weakness. Dr. Fraser recommended aqua therapy and medication as treatment.

On July 29, 2009, Dr. Stephen Elliott, D.O., reviewed Kittelson's medical records and provided Disability Determination Services ("DDS") with a physical residual functional capacity ("RFC") assessment for Kittelson. Dr. Elliott determined that Kittelson could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Elliott also determined that Kittelson could occasionally climb ramps and stairs, balance, stoop, kneel, and crouch, but never crawl. Dr. Elliott further opined that Kittelson was limited in her ability to reach or lift overhead on her right side. Lastly, Dr. Elliott determined that Kittelson should avoid extreme cold, extreme heat, vibration, fumes, odors, dusts, gases, and poor ventilation, and hazards such as machinery and heights. Dr. Elliott found no visual or communicative limitations.

On August 17, 2009, Kittelson met with Dr. John M. Stanec, M.D., complaining of neck pain. An MRI done on the same date, showed "posterior disc osteophyte complex at C5-C6 causing some mild spinal canal stenosis and moderate left neuroforamen stenosis."[7] Upon examination, Dr. Stanec offered no diagnosis. Dr. Stanec opined that:

> [Kittelson] had trigger points identified in her neck, but did not respond to [trigger point injections] done in the past. She does have evidence of stenosis on MRI, but does not have any radicular symptoms. However, she may be having discogenic pain contributing to her myofascial pain and may benefit from facet injections.

---

[7] Administrative Record at 414.

(Administrative Record at 417.)

On January 4, 2010, Kittelson met with Jennifer Berns, PA-C, complaining of depression. Kittelson informed Berns that she had suffered from depression for "many years," but her depression had worsened since her diagnosis of breast cancer. Berns noted Kittelson reported that "her moods are up and down on any [] given day. . . . She has had some difficulty sleeping. She also reports low energy level and a bit of difficulty with concentration and memory."[8] Upon examination, Berns diagnosed Kittelson with major depressive disorder and post-traumatic stress disorder. Berns recommended medication and counseling as treatment.

In February 2010, Kittelson was transferred to Dr. Mark W. Mittauer, M.D., for her mental health care. Upon examination, Dr. Mittauer diagnosed Kittelson with major depressive disorder, generalized anxiety disorder, post-traumatic stress disorder, and suspected maladaptive personality traits and possible personality disorder. Dr. Mittauer recommended medication as treatment.

In April 2010, Kittelson met with Dr. Sinda Eggerman, Ph.D., for counseling. Dr. Eggerman found that Kittelson suffered from the following depressive symptoms:

> [Kittelson] has some sleep difficulties, some loss of energy. She has lost concentration. She has some feelings of worthlessness. She feels hopeless. She has lost interest and motivation. Her thinking has slowed. She is irritable. She has crying spells. . . . She has difficulty coping. . . . She is feeling overwhelmed.

(Administrative Record at 510.) Upon examination, Dr. Eggerman diagnosed Kittelson with major depression and anxiety disorder. Dr. Eggerman recommended psychotherapy as treatment.

---

[8] *Id.* at 521.

On December 13, 2010, Dr. Mittauer completed a "Report on Incapacity" for determination of eligibility for county funded assistance. Dr. Mittauer diagnosed Kittelson with major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder. Dr. Mittauer opined that Kittelson's condition was "probably" permanent. Dr. Mittauer concluded that Kittelson could not work or seek work for at least three months, and recommended that her work capabilities should be re-evaluated in six months.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Kittelson is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not

12

disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Kittelson had not engaged in substantial gainful activity since December 9, 2008. At the second step, the ALJ concluded from the medical evidence that Kittelson had the following severe impairments: history of breast cancer, status post lumpectomy, degenerative disc disease with cervical facet arthropathy, mild dysphonia, major depressive disorder, anxiety disorder, personality disorder, a history of substance abuse, including alcohol dependence, cannabis abuse, methamphetamine dependence, and nicotine dependence, a history of a nodule on her vocal chords, and gastroesophogeal reflux disease. At the third step, the ALJ found that Kittelson did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Kittelson's RFC as follows:

> [Kittelson] has the residual functional capacity to perform light work . . . in that [she] is capable of carrying/lifting twenty pounds occasionally and ten pounds frequently. She can sit for six hours of an eight-hour day, and can stand/walk for six hours of an eight-hour workday with the ability to push and pull and operate hand and foot controls within weight limits given. [Kittelson] can occasionally climb ramps/stairs, and occasionally balance, stoop, kneel, crouch, and crawl. [She] should avoid concentrated exposure to extremes of cold and heat, hazards, vibrations, fumes[,] odors[,] gases, and poor ventilation. She cannot climb ladders, ropes, or scaffolds. She is capable of performing simple, routine, repetitive work and is able to use her voice for short conversations but not for continual talking.

(Administrative Record at 14.) Also at the fourth step, the ALJ determined that Kittelson was unable to perform any of her past relevant work. At the fifth step, the ALJ determined that based on her age, education, previous work experience, and RFC, Kittelson could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Kittelson was not disabled.

14

### B. Objections Raised By Claimant

Kittelson argues that the ALJ erred in two respects. First, Kittelson argues that the ALJ failed to properly evaluate her subjective allegations of disability. Second, Kittelson argues that the ALJ's RFC assessment is flawed because the ALJ failed to take into consideration the amount of time she would need to be absent from work due to her impairments.

### 1. Credibility Determination

Kittelson argues that the ALJ failed to properly evaluate her subjective allegations of disability. Kittelson maintains that the ALJ's credibility determination is not supported by substantial evidence. The Commissioner argues that the ALJ properly considered Kittelson's testimony, and properly evaluated the credibility of her subjective complaints.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ should also consider a "a claimant's work history and the absence of objective medical evidence to support the claimant's complaints[.]" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citing *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ, however, may not disregard a claimant's subjective complaints "'solely because the objective medical evidence does not fully support them.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting *Wiese v. Astrue*, 552 F.3d 728, 733 (8th Cir. 2009)).

Instead, an ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the record as a whole." *Wildman*, 596 F.3d at 968; *see also Finch*,

15

547 F.3d at 935 (same); *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the Polaski factors.'" *Renstrom*, 680 F.3d at 1066 (quoting *Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir. 2010)); *see also Ford*, 518 F.3d at 982 (An ALJ is "required to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.' *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (providing that deference is given to an ALJ when the ALJ explicitly discredits a claimant's testimony and gives good reason for doing so); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)).

In addressing Kittelson's credibility, the ALJ made the following observations:

> After careful consideration of the evidence, the undersigned finds that [Kittelson's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Kittelson's] statements concerning the intensity, persistence and limiting effects of these symptoms are not

credible to the extent they are inconsistent with the above residual functional capacity assessment. . . .

Although [Kittelson] has described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding [Kittelson] disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if [Kittelson's] daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to [her] medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision. Overall, [Kittelson's] reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

At one point or another in the record (either in forms completed in connection with the application and appeal, in medical reports or records, or in [Kittelson's] testimony), [Kittelson] has reported a myriad of daily activities consistent with the residual functional capacity detailed above. The level and severity of medical findings, however, do not correlate to a level of complete disabling impairment. She is able to attend to personal care, household chores, shopping, and getting around town by herself on the bus. [She] uses only over the counter [drugs] for pain and has undergone nerve ablation therapy for her neck pain with some success. Treating sources have observed that her smoking is most likely contributing to her voice problems. [Kittelson] has some limitations with the right upper extremity due to neck pain, although she reportedly had been able in 2010 to perform much more rigorous chores. Her neck pain increased after falling when intoxicated. There is no evidence of limitations due to her history of breast cancer. [She] complained of limits in her ability to concentrate due to depressive symptoms. Her results with psychotropic medications have been variable and [Kittelson] has not been entirely forthcoming with her alcohol use to her mental health providers. . . .

17

In only one year since 1980 has [Kittelson] made substantial gainful activity level earnings, and in fact did not work at all between 1981 and 1995. Her sporadic work history raises some questions as to whether the current unemployment is truly the result of medical problems. [Kittelson] also expressed concern over her criminal record impacting her ability to find a job.

Given [Kittelson's] allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of permanent restrictions placed on [Kittelson] by the treating doctor. Yet a review of the record in this case reveals no restrictions recommended by the treating doctor. Two doctors have filled out 'incapacity forms' for [Kittelson] to receive county funded mental health/substance abuse services, but indicate that their recommendations are temporary in nature. . . .

(Administrative Record at 17-18.)

It is clear from the ALJ's decision that she thoroughly considered and discussed Kittelson's treatment history, medical history, functional restrictions, medication use, work history, and activities of daily living in making her credibility determination. Thus, having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Kittelson's subjective allegations of disability were not credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited Kittelson's subjective complaints, the Court will not disturb the ALJ's credibility determination. *See Johnson*, 240 F.3d at 1148. Even if inconsistent conclusions could be

drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 2. *RFC Assessment*

Kittelson argues that the ALJ's RFC assessment is flawed and not supported by substantial evidence. Specifically, Kittelson argues that when making her RFC assessment, the ALJ failed to take into consideration her need for absences from work due to her impairments. In support of her argument, Kittelson refers to the "Personal Pain/Fatigue Questionnaire" she filled out for the Social Security Administration in July 2009. In the questionnaire, Kittelson opined that she could not find work because she needed "to take many days off for all of my medical/doctor appointments."[9] In her brief, Kittelson asserts that "[o]ver the course of twenty-five months, [she] had some seventy appointments, procedures, examinations, and tests."[10] Kittelson concludes that this matter should be remanded for further consideration of her RFC.

---

[9] Administrative Record at 209.

[10] Kittelson's Brief (docket number 10) at 15. Interestingly, while Kittelson provides a summary of her medical history in her brief, she only points out 19 doctor's appointments in a 23-month time period, instead of the 70 appointments in a 25-month time period she claims are found in the record.

Furthermore, in her brief, the Commissioner also questions Kittelson's suggestion that she went to 70 appointments over a 25-month span. Specifically, the Commissioner argues that "[a]lthough [Kittelson] had a number of doctor's appointments during the months following her December 2008 lumpectomy, [her] breast cancer resolved by May 2009 and her subsequent treatment consisted of monthly follow up appointments. In fact, the list [Kittelson] cites in her brief demonstrates that after May 2009, [she] received only eight treatments in a seventeen month period." Commissioner's Brief (docket number 12) at 22. The Commissioner also points out that "there is no evidence that [Kittelson's] doctor's appointments would each require her to miss a whole day of work." *Id.* In summary, the Commissioner insists that "[t]he ALJ could reasonably conclude, absent evidence other than [Kittelson's] speculation, [her] impairments would not cause her to frequently miss work." *Id.*

19

When an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley*, 152 F.3d at 1059. The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson*, 361 F.3d at 1070). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey*, 503 F.3d at 697 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

Here, the record demonstrates that Kittelson attended numerous doctor's appointments after being diagnosed with breast cancer in December 2008. When her radiation treatments concluded in June 2009, her doctor's appointments decreased. For example, in addition to some appointments for neck and arm pain, Kittelson primarily had monthly appointments lasting one hour or less to treat her difficulties with depression.[11] The Court is unconvinced that such appointments lead to the conclusion that Kittelson was incapable of full-time employment. Moreover, the record lacks any opinion evidence from a treating doctor stating that Kittelson was unable to work due to absenteeism for attending doctor's appointments. Additionally, while Kittelson claims that she is unable to work due

---

[11] While there mental health appointments were generally once per month, on a few occasions she had two appointments in a given month. *See* Administrative Record at 467-71, 492-525, 537-43, 544-45.

to needing to "take many days off for all of my medical/doctor appointments," the Court concluded in section *V.B.1* of this decision that the ALJ properly discounted Kittelson's subjective allegations of disability.

Therefore, having reviewed the entire record, the Court finds that the ALJ properly considered Kittelson's medical records, observations of treating physicians, and Kittelson's own description of her limitations in making her RFC assessment for Kittelson.[12] *See Lacroix*, 465 F.3d at 887. Furthermore, the Court finds that the ALJ's decision is based on a fully and fairly developed record. *See Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007) (providing that an ALJ also has a duty to develop the record fully and fairly). Because the ALJ considered the medical evidence as a whole, the Court concludes that the ALJ made a proper RFC determination based on a fully and fairly developed record. *See Guilliams*, 393 F.3d at 803; *Cox*, 495 F.3d at 618. The Court concludes that Kittelson's assertion that the ALJ's RFC assessment is flawed and not supported by substantial evidence is without merit.

## VI. CONCLUSION

The Court finds that the ALJ properly evaluated Kittelson's subjective allegations of disability. The Court also finds that the ALJ properly considered the medical evidence as a whole, and made a proper RFC determination based on a fully and fairly developed record. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

1. The final decision of the Commissioner of Social Security is **AFFIRMED**;

2. Plaintiff's Complaint (docket number 3) is **DISMISSED** with prejudice; and

---

[12] *See* Administrative Record at 15-19 (providing thorough discussion of the relevant evidence for making a proper RFC determination).

3.    The Clerk of Court is directed to enter judgment accordingly.

DATED this _5th_ day of June, 2013.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA